https://www.google.com Okay, the next argued case is number 181189, Performance Pricing Holdings v. Google LLC. against Google LLC. Mr. Telsche. Good morning, your honors, both in the courtroom and remotely, and may it please the court. The 195 and 059 patents both share a common specification. Both patents have claims that are directed to the specific and unconventional idea of connecting user clicks to bonus impressions or decreased price based on user activity, third-party activity in which the internet users are out there determining which ads are better, clicking on them, that's recorded, and the bonus impressions are tied to that. The advantages from this, and it it's undisputed on this record, it was an important invention in internet advertising. The advantages which are set forth in the patent have never been debated by Google or found contrary by the Patent Office, so it is an important invention. One thing that this court should certainly stand for is that the Alice test be applied as a matter of law. In this particular case, step one, the panel was really all over the place. They found six different variations of what the abstract idea is, and I get that there can be shades of gray with abstract ideas, but it's all over the place, but they ultimately conclude with one at page 29 of their opinion. And that's where, in so many of those courts' cases, that's where we get to the meat of the Alice determination, step two. And in step two, the law is absolutely clear that you have to now take what the abstract idea is, what is it that you found, you have to compare the abstract idea to the claims to determine whether the claims are narrowed, confined, or tied down in a way that, and this is the test quote, practical terms, the claims amount to more, significantly more than the abstract idea itself. Well, but with the inventive step, limitation is critical. It's absolutely critical. In this case, if you look at the opinion, it pages 29 to 35, six pages devoted to step two, not one, well, excuse me, one time. At page 32, one time, do they even mention bonus impressions? And there's no analysis. They just say it in passing when they're talking about ultramershal. At no point in the opinion, and from pages 29 to 35, does the panel ever say, this is what we found the abstract idea to be, here are the limitations in the claim, and does that tie it down? Can I ask you to address the following? So one version of the argument on the other side, and maybe what the board said too, is something like this. The abstract idea here is adjusting the terms of dealing by altering the prices and quantities, or quantities, of contracts. The only, and to do, and doing that on the basis of a certain class of consumer reaction. Here, you know, in the advertising world, there are, they're kind of like double-sided markets, and there are three parties sort of involved, the viewer, the the advertiser, and the publisher. So even if there is something tied down about the use of performance information by consumers registering a certain level of interest, that doesn't actually tie it down to anything non-abstract. Because all that's being done is using that consumer reaction to adjust a term of the contract. To me, that's an incorrect generalization of what the invention is, and it's not consistent with what... I should say, and that may be an extraordinarily valuable thing to do. Correct. Well, I mean the benefits, I mean there's, it's been in practice for over 15 years, and its advantages have proven true, and there's no dispute about those advantages. What the panel found... But why aren't they the wrong kind of advantages for purposes of 101? Well, what 101 requires is that you have a specifically claimed method, and you have to compare the specifically claimed method to the abstract idea. What the Patent Office found was that the abstract idea was analyzing and collecting data in a performance-based advertising model. The patents discuss, and Google doesn't debate, nor did the Patent Office find differently, that in performance-based advertising, the price goes up as you have more viewers, or in the context of internet, more clicks. That is what their abstract idea was found to be, was based on performance-based pricing. It is an undisputed record that in performance-based advertising, the abstract idea, so called by the Patent Office, that as views go up, price goes up. As you click more, the price goes up. That's how it was. The unconventional thought was, and it had never been done before, unconventional, and this is Google with all their resources, could not find that this has ever been done before in any form of advertising. What do you do with the idea, which I think we've articulated several times, I think maybe the briefs quote in particular, synopsis, that never been done before, abstract ideas are still abstract. And I think that's a great point. So the question is, what is meant by abstract? And that is, this Court has what I would say three buckets of abstract ideas that if I were looking, and I know the jurisprudence, I've dealt with this issue a lot. One of them is, for example, Allison Bilski, where we have a conventional activity and it's performed with computers, and just performing conventional activity on computers is abstract. You've got, for example, electric power grid, where we found that in the power grid arena, where we collect data, and we bring it in, and we manipulate data, and we display it, that that's an abstract idea. And we found then in the other class of cases, results-oriented claiming, where you have these, and it's software patents are akin to this, where you have like Module 1 and Input 1, you have these vague, techie-sounding claims, but at the end of the day, they don't mean anything, and you have a result that's claimed. And Judge Bryson, sitting by designation and loyalty conversion, I think is an excellent case, where he talks about patent claims that are dressed up in the argot of invention, but they claim only a result. This case doesn't fall into any of that. In this case, there is a specific method, where you take connecting clicks to bonus impressions, based on viewers, third parties, that are out there looking at the ads, deciding what they like, they click it, it's recorded, and the bonuses are tied to that. If you look to, for example, and this is the danger of Alice. How would you describe the difference between this case and Ultramershal, in particular? Thank you for asking that question. Ultramershal, I think, is probably one of the most classic cases. It shouldn't have survived 101. Why? What was Ultramershal? Ultramershal was a case in which, in order to get free media content on the internet, you had to look at a paid advertising, or excuse me, an advertisement. So the notion is, you look at the ad, I'll give you the free stuff. That is how public TV has worked since the beginning of public TV. If I want to watch the Super Bowl, I have to watch the advertisements, and then I get the free Super Bowl. If I want to watch Dateline NBC, I got to watch the advertisements, then I've got to, then I get my news, or my Dateline NBC, whatever I'm getting. That's conventional, and tying conventional activity to the internet is not patentable. And if you look at DDR, this case is right on top of DDR. In DDR, there was one advance. Internet users in DDR would be on, clicking around, looking, I get to a website. I'm at that website, and now I see an ad I like. Prior to DDR, if you clicked on the ad, it took you to another website. All that DDR did, only one thing, and this is patent law, incremental steps of improvement. All that DDR did was pull the content back to the website, so you didn't leave, and that helped retain customers. Let's look at, let's look at Bascom. In Bascom, what was, there was no new firewall in Bascom. Bascom was simply taking existing firewall and putting in a different location, remote, from the user. And the little thing was moving the location of that server. It was patentable, and that's patent law. I mean, right now, we have, in this country, we have. What physical thing have you moved here? The physical thing, it's business method, so that's why we're in the CBM. And I'll start by saying, in Alice, the court specifically says business methods are patentable. So the method here, what is the specific method here? And it's specifically claimed, and that's all patent law requires. To not be abstract, is that it be specific, that it is tied down and confined so that it's more. I'm sorry, what did, what did you say Alice said? It, it says specifically that business methods are patentable. Some, some things that might be called business methods can be patentable. Correct. That's what Bilski said. That doesn't mean that adjusting the terms of sale can be one of those things. And, and that is how Google characterized this, and that is not this invention. This invention has nothing to do with a pricing model for advertising. The, the negotiation on pricing occurred before our patent. That same negotiation for pricing occurs after our patent. What the patent says, what the patents say is, not how to negotiate the best price or any particular price. The invention here is specific. Connecting clicks to bonus impressions based on third-party activity that's recorded, monitored, and then you give the bonus impressions. And it, it leads to the advantages of better ads. That's one of the patents. And then the other one is some kind of price adjustment. The decrease in price. Have I, is this my 10 minutes? I want to make clear that I'm. Well, if there's a thought you want to finish, we'll preserve your rebuttal time. No, that's, that's it, your honor. Thank you. Thank you. Thank you. Ms. Major. May it please the court. I want to start with step two, because I think that is really the thrust of the argument from the other side. With respect to thrust, with respect to step two, I think the synopsis decision is directly on point. And that is because what you hear from the appellant, and what you see throughout their brief, their arguments before the board, and at every step along the way, is the notion that they have an inventive concept because they claim that the pricing model that they have in their claims is novel. That isn't the test under step one or under step two. Synopsis says quite clearly that a claim for a new abstract idea is still an abstract idea. And that is precisely what we have here, even if you were to grant them their argument that this was in fact a novel pricing model. Ultimately, what Alice step two requires is something more, something that will tie that abstract idea into something that is concrete in the claims. And here we don't have that. And the reason that we don't have that is what the claims provide is completely conventional computer hardware, computer, computer network. There's no dispute about that. Their own expert admitted, and this is at appendix page 2972, he agreed that the hardware that is described in the patent for implementing the inventions is generic computer hardware. He even said that the value of the invention here has nothing to do with the computer or the performance of the invention on the discussed. Well, it's performed by computer. That's not a matter of dispute. Exactly. But that's not saying that any sequence of events, any method or system performed by a computer is never patentable. We know that. So let's be specific to that which they say is their inventive step. Right. So on that point, Your Honor, there's nothing in the claim that's hardware that would be the inventive step. So then you have to look to this algorithm that they're claiming is the inventive step. And if you look at the algorithm that they're pointing to, their expert admits that each of the steps of the claim was routine and conventional. And this is an appendix. They say that each step can be performed routinely through computer initiated algorithms, but we still need to concentrate on the specific step, not in the prior art, as seems to be the case. Perhaps the searches were inadequate. I don't know. But there were no 102, 103 issues. The only question was that of secondary considerations, which is a separate matter. Right, Your Honor. So I think there's a couple of things here. So first is there was no 102 or 103 challenge brought in this petition. That's not to say that there wouldn't be one. But in this petition, we're only dealing with 101 and then the 112 issue. With respect to 101, I think what you're pointing out is exactly what I'm getting at, which is their only articulation of this inventive step is the suggestion that no one before this time had thought of giving bonus impressions in response to user action. And they're saying that's the thing that's novel and new about our invention. That is itself an abstract idea. That is not something that actually ties the claim down. What this court's precedent has found to satisfy Alice Step 2 is something that changes either the hardware or the algorithm in a way that is specific and technological. As synopsis said, you can't simply say, well, on Alice Step 2, I have a new idea. And yes, that idea might be abstract, but it's new. Therefore, I have an inventive step. Do they have a whole sequence of events of steps implementing the concept? Certainly, Your Honor. But that's no different than in Ultramershal or in BiSafe or in any of the many cases where this court has found that there's an abstract idea and there's an insufficient inventive step because all that you are doing in the claim is implementing that abstract idea using conventional and routine hardware and conventional, in this case, conventional and routine implementation of the hardware or application. You're overstating, I think, where precedent takes us. We know that there are lines being drawn difficult lines to draw. There's a good deal of attention being given to that. But here we have a whole sequence of steps for an idea which we're conceding is a novel concept because there was no citation to show otherwise. So why aren't the sequence of steps that implement a novel concept, why don't they include an inventive step? Because, Your Honor, all that they are doing is implementing the abstract idea. So I would agree with you that what you're dealing with here is an argument from the other side or the contention from the other side that the inventive step that is being provided is the novel idea of giving bonus impressions in response to user action for the 195 patent or for the 059 patent, the idea of reducing the price for the advertisements based on the action by the user. In both cases, all that we are doing is implementing that abstract idea. And if you look at the claims themselves, the claims aren't providing any more detail as to or technological solution of how to do that than you would find in the claims in Ultramershal, for example. In Ultramershal, there were numerous steps that were being implemented to achieve the process of previewing an advertisement in order to pay for the copyrighted material. In the same way, what these claims do is they say, look, define a contract between the buyer and the seller, and I'm looking at the 195 patent at page 109 of the appendix. Define a contract where they set a price for the advertisement, provide the number of impressions, automatically record the number of times that there's a view of that impression, and then give bonus impressions based on that. The specification itself acknowledges that there's nothing inherently technological about that. In fact, what it says is you could do this in the context of a billboard or print media or radio ad or a television ad and record the user action based on, for example, phone calls into a particular number. There's nothing technological about this. Ultimately with this... The law does not require that an inventive step be technological. I agree. It requires that it be inventive. It requires that it be inventive, but the inventiveness is about tying down the abstract idea, not simply that the claim is novel because otherwise the 101 inquiry would just reduce into a 102 or 103 inquiry. Remember, of course, claim step two of Alice is about the modification to step one or is about the implementation of the invention to remove it from the ambit of the abstract idea that's unpatentable. It can't simply be, oh, we have an abstract idea, but it's novel, therefore patentable, because all then you have is a 102 analysis or a 103 analysis. The inventive step has to be something that takes the abstract idea and actually tethers that to something concrete and tangible so it is no longer an abstract idea. Otherwise, all you have is the 102 or 103 inquiry. So we have the sequence of events where we have the predetermined number of impressions. I'm looking at claim one. Correct. The automatic recording. The other automatic determining. These are all steps. We agree they're conducted by computer, but whether they're conducted by computer or some other way doesn't really affect the inspection to determine whether there is an inventive step. And we get the automatic determination all performed, and they describe in their specification straightforward algorithms to conduct each of these steps, but they say the sequence is new and the steps are not shown in the prior art and therefore by any analysis of patentability are new and conceivably patentable. So I would differ with you on one point within that, which is that the steps are not themselves new. So I think what their expert said is you could take each of the types of actions that is claimed in this, for example, presenting impressions, for example, counting user feedback. All of that was known. What they're saying is new is the idea that if you record a certain number of clicks or certain number of actions, you provide bonus impressions. All that they are arguing is new is a particular contract for pricing advertising. So there in the 195 patent, that contract is if I give you a certain number of impressions and you get a certain number of user actions back, I'll give you more impressions. That's the terms of a contract. In the same way for the 059 patent, all that they're arguing is new. They're not arguing there's any new hardware, any change whatsoever to the way in which you serve ads, or even any step in ad serving that is new or different than what was done before. It is only the terms of the contract, and in the 059, that is, I'm going to give you, I'm going to agree to give you a certain number of impressions for a certain price. Is there a dispute about whether collecting clicks is new? I don't believe there's a dispute about that, Your Honor. So their expert acknowledged, and I think he would have to, that that can't be new. And the reason for that is if you look at, for example, the billboard example in the patent, it acknowledges that you could put a phone number on a billboard and call that number, and then record the number of people that call. In the same way on the internet, recording interaction with an advertisement isn't something new, and there was no suggestion from them that that itself is new. It's only the idea, the abstract idea, of changing the pricing model for the advertisement based on that into one of these two particular flavors of pricing model that is alleged to be new. And that is simply the definition of the contract between buyer and seller for purposes of creating a contractual advertising relationship, which is precisely the kind of thing that's abstract in Ultramershal, in OIP, in BuySafe, in Versata. There are all of these cases that found that what all you're doing is taking this abstract idea and defining the interaction between two parties with respect to pricing or with respect to advertising. Those are abstract ideas, and saying implement them on a computer using these steps isn't enough. I mean, if we look at the process and the claim in Ultramershal, it does exactly what Your Honor was just pointing out. It says, here's an idea of how to structure the relationship for purposes of providing advertising before you see copyrighted material. And here are the steps of the process that we're going to follow. That's no different than the claims of the 159 and the 095. They define the contractual relationship. They implement it on conventional hardware using conventional known steps on that hardware. And the only thing that is even alleged to be different is the structure of the contract between the buyer and the seller. And that cannot be enough to take what is otherwise an abstract idea and render it sufficient under step two. Because if that were enough, then Ultramershal, OIP, BuySafe, all of those cases would have been decided differently. And what it would ultimately do is say, well, all you're doing ultimately on step two of Alice is a 102 inquiry, and it would collapse the 101 and 102 inquiries into the same thing. That's not what step two requires. Did your petition include sections 102 and 103? It did not, Your Honor. So we, on the CBM, we filed on 101 and 112 for the 059 and 101 for the 195. That's not to say that in a district court action, for example, if we hadn't filed the CBMs or if they'd gone differently, there wouldn't be 102 or 103 art. But the question that was presented on the 101s, because it was a very focused and very specific question, was are these patent eligible? And we made the showing and the board did a detailed analysis of why, applying this court's precedence, these are not patent eligible. So that was the decision that was made, was to focus on patent eligibility. And on the 059, the 112 issue, because the claims are such a mismatch from the specification. So that was the... Yes, the board mentioned 112, which is something that we rarely see in these cases. Yes, Your Honor. So the board on the 059 found, in addition to finding that all of the claims patent, not patent eligible, it found on the 059, the challenge claims were also found invalid under section 112. And the reason for that was, and again, there's no question here with respect to what the legal standards are. There's no legal challenge. And this is just as to the 059. This is just as the 059. And Your Honors wouldn't need to reach this, of course, if you affirm the patent eligibility decision. But on just the 059 patent, with respect to 112, the question that was presented was can you have claims that claim a process or a method that is directly in conflict with the purported invention that's described in your specification, and in fact capture the very thing that your specification is criticizing as the problem that you were trying to solve? And there's no question under this court's precedent in Baimeda and in Bamberg that that poses a fundamental 112 problem. You don't think that that 112 ground is undermined by let's just call it an assumed fact that this method of pricing turns out to make the Google here a ton of money? No, Your Honor, I don't think it's undermined by that. And the reason for that is there, so first of all, so that systemically this actually kind of guarantees you a whole lot more money than you were getting from the earlier one. I'm almost out of time or maybe just over time. May I respond to that, Your Honor? So, Your Honor, I don't think it makes a difference. First of all, the question assumes the premise that Google practices the patent that has not been shown that it's on the record. And I think second of all, there are lots of different ways to implement advertising structure, as many different ways as you can create contracts to do it. That's precisely the 101 problem. With respect to 112, this patent purports to claim a very specific model, and these claims are very specific in requiring that when you actually set the price, you reduce the price over time based on action from the user. The specification directly and repeatedly criticizes that and says that's precisely the kind of model that it wants to overcome because it doesn't give the seller guaranteed revenue. So for this issue, one simply doesn't look outside the four corners of the document. For this issue, I don't think you need to look outside the four corners of the document and the experts who talk about this. And there was a credibility judgment on the experts by the board on that very issue. You know, so the one thing I noticed in the argument is when they're talking about 112, are patents specific, and when we're talking about 101, it's not specific. What we have before us is, and you've picked up on your question, Your Honor, I mean, this was a real invention. Money was paid by a real company that still has a business based around this patent. They paid for the patents. It passes 102. It passes 103. Google's using this invention, or at least we claim. And that's a real invention that's just going by on a test. The panel never applied the test in step two, and if we're going to say patents are going down, then they at least deserve the dignity of to the specifics of the claim. And this is a specific method. They keep calling it a pricing model or adjusting a contract. It is a method by which clicks by users are connected to bonus impressions or decreased price based upon third-party users looking at ads on the internet. It's never been done before. It's a specific method. If patent law stands for anything, it's that incremental improvements that are specifically claimed is all the patent law requires, and we find ourselves in a crisis. You can't, on IP law 360 and IP watchdog, you can't help but read, and Alice is ruining the patent system on software patents, business methods, and if you look at Alice, the seminal decision, the court says we can't let the exception be the rule. And we've now gotten to a point where arguments, like I heard the argument, it's not technological. You were correct to say it doesn't have to be technological. Bilski specifically says it doesn't have to be technological. The Patent Act talks about processes. The Patent Act doesn't say technological. Business methods are patentable. State Street Bank says so. Alice says so. This is a specific business method. It's as specific as DDR. As I said, DDR was one little incremental step. Instead of taking somebody away, we bring the content to us. Baskin, no new firewall, nothing different. What was different? One thing in Baskin, that the location of the firewall would be in a remote location. That's it. And as long as that incremental step was claimed, if we look to Amdocs, what was different in Amdocs? Amdocs, one little thing. Amdocs used to have a central server where you would process and store data. Amdocs idea was process the data closer to the source. That prevents congestion. One difference. That's all it took in Amdocs. MCRO. There's no new computers or anything in MCRO. This is all software running on a computer. MCRO rules with phenoms and morphs to automate lip-syncing. Rules running on a computer. Specific. That was enough. In this case, we have a specific rule. This is not about adjusting contracts or making contracts or setting price or any such thing. They mentioned Versada. Versada was a setting the price case. It was grouping customers and products in a way that you could determine a price. That's what people have been doing forever. The Versada case turned on the notion of if you automate that with computers, is that patentable? Alice says no. Bilski says no. We all know that's rote law at this point. Four years after Alice, we know that if you have a conventional activity and you automate it with the computer, that's not patentable. But we have to be remiss in turning Alice into a rule that is now that now abstract idea is not the exception for software and business methods. It's the rule. And we found this past, I call it like the finger to the wind test. It doesn't feel like it's something that should be patentable. That's exactly what went wrong here. Google sold the panel on the fact that it wasn't technological. Don't take my word for it. Look at pages 24, 30, and 33 of this opinion where the Patent Office said several times, this is not technological. If that's the rule in CBMs, you may as well not even have a CBM proceeding. Because the litmus test for getting CBM is that you're not technological. And all of a sudden, there's a default that if I'm not technological, I don't get a patent. This is specifically claimed. Connecting clicks to bonus impressions based on third party activity that's recorded on servers and bonus impressions are produced. It was a wonderful invention with wonderful advantages. And as to written description, I'll just briefly comment on that. That was completely wrong. The patent never says that you can't use this method with performance-based advertising. It says in column one, line 60 to 65, you want a reasonable balance between performance and fixed fee contracts. This invention will help you improve your balance. It never once says that you can't use this invention with a performance-based contract. It obviously works that way as well. The written description portion of this decision is incorrect. Nothing further unless you have more questions for me. Thank you, your honors.